IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CARGILL, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | 8:11CV81 |
| | ) | |
| V. | ) | |
| | ) | |
| KURT KROEGER, KATHY KROEGER, and H & M FARMS, INC., | ) ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) ) | |

      I have orally granted Cargill's motion for judgment as a matter of law regarding a variety of matters. Contemporaneous with my oral decision, I more fully explain my reasoning in this memorandum.

### *The Contract and Affirmative Defenses Regarding Target Yields*

      H&M Farms, Inc., has judicially admitted, and it is undisputed, that there existed "an express contract for 2010 crop inputs," "that there is an express contract evidencing an intent to be bound" by H&M Farms, Inc., and that the defendants do "not deny the existence of a contract for 2010 crop inputs for H&M Farms . . . ." (Filing no. 136 at pp. 8-9.) I relied upon those judicial admissions when I ruled on the summary judgment motions. (E.g, filing no. 156 at pp. 6, 10.) It is also undisputed that H&M Farms, Inc., failed to pay Cargill after Cargill provided the 2010 crop inputs and services.

      After giving the defendants the benefit of every reasonable inference to the contrary, no reasonable jury could come to any other decision save for the following:

- \*     One contract (consisting of a variety of documents and a course of dealing) existed between Cargill and H&M Farms, Inc., whereby Cargill agreed to provide crop inputs and services for 2010 and H&M Farms, Inc., agreed to pay Cargill for those crop inputs and services.

* H&M Farms, Inc., breached that contract because no payment has been made to Cargill for the crop inputs and services that Cargill in fact provided.

* Cargill did not warrant, represent or guarantee that any "target" yields would be met during 2010, and H & M Farms, Inc., was not entitled to withhold payment because of any alleged performance issues or alleged misrepresentations.

* The nutrients supplied by Cargill were all fit for the ordinary purpose for which they were intended. For example, there is no dispute that manganese sulfate is a nutrient for corn and there is no dispute that Cargill in fact supplied manganese sulfate.

* Cargill substantially or fully performed its side of the bargain.

Regarding affirmative defenses based on "target" yields, no reasonable jury could conclude that the yield goals established jointly between Mr. Kroeger and a representative of Cargill were warranties or representations by Cargill that the goals would in fact be achieved. Indeed, there is no evidence that the Kroeger farming operation had *ever* yielded those target goals in the past. In fact, the evidence is to the contrary. (E.g., Exhibit 97D ("Comparison of Howard County, Nebraska and H&M Farms, Inc.") (Column entitled "H&M Farms(a)" deriving data from defendants' crop insurance records). Consequently, it would be entirely unreasonable for anyone to conclude that the yield goals were warranties or representations.

### *Causation*

I now address the issue of causation from the perspective of the defendants' claims. I find and conclude that no reasonable jury could determine that Cargill's application of manganese resulted in manganese toxicity and a reduction in crop yields on the farm operated by defendants. This is so after giving the defendants the benefit of any and every reasonable inference to the contrary. In other words, sufficient evidence of causation is

-2-

lacking for the counterclaims and affirmative defenses that are based upon the presence of manganese toxicity.[1]

After hearing the entirety of the evidence, I arrived at this decision for a variety of reasons. The following six points illustrate some, but not all, of the reasoning that supports this ruling:

* It is undisputed that the defendants' farm has consistently underperformed the county average for corn yields.

* The defendants' farm consists to a significant degree of soils and landscape that make the growing of corn relatively difficult when compared to other farms in the county.

* Setting to one side the instant case, there has never been a case of manganese toxicity in corn in Nebraska the existence of which has been established to a reasonable degree of scientific certainty. Essentially, manganese toxicity in corn is unheard of in Nebraska.

* The competent evidence establishes that (a) soil and corn tissue samples were taken from the defendants' farm during the relevant growing season and at or after harvest, (b) those soil and tissue samples were tested by Dr. Ward, a highly qualified scientist with specific and ongoing experience in assessing toxicity levels and other pertinent levels in growing crops, and (c) that testing failed to reveal a toxic level of manganese or anything approaching a toxic level. In this regard, competence evidence establishes that manganese toxicity in *corn tissue* is not likely to be present unless manganese is found

---

[1] To the degree that defendants' now claim some other nutrient was also at fault, the Rule 50 motion is granted also as to any such claim. Throughout the preparation of this case and at trial the defendants' focus was on manganese toxicity and a belated claim that some other nutrient was at fault is of the "Hail Mary" variety and unsupported by the evidence.

at a level approaching 300 parts per million. In that same vein, competent evidence proves that manganese levels in plants may be harmful when *soil tests* reveal manganese at 50 parts per million or greater. Parenthetically, the only evidence of a soil test that defendants tried to present was a soil sample that had literally been baked in Mr. Kroeger's home oven, and that test was excluded for obvious reasons.

* The defendants rely upon a "use guide" for Man-Grow 32G manganese sulfate for "in-furrow" application. Even ignoring the fact that the manganese here was broadcast and not applied in the furrow, that guide specifically states: "<u>Always follow soil and tissue test</u>[s]." (Exhibit 85 (underline in original)). The defendants ignore this direction when it comes to the soil and tissue testing conducted by Dr. Ward.

* An unbiased employee of the University of Nebraska, Lincoln established a test plot at the University's agricultural testing farm in an effort to address the defendants' concerns about manganese toxicity. She was unable to induce manganese toxicity in corn after applying a different although comparable form of manganese at various rates roughly comparable to or above the rate applied by Cargill. Recognizing their dilemma, the defendants tried to respond with a test plot of their our own, but that test plot was excluded because it was conducted *after* discovery closed.

A few words about the defendants' evidence is in order. It is not my job to judge the credibility of the witnesses or the relative strength of their testimony in reaching this decision and I have not done so. But, for a variety of objective reasons, the competent evidence is insufficient to get the defendants to the jury on the issue of causation. In the face of contrary soil and tissue sampling data derived from the allegedly impacted corn showing the absence of manganese toxicity, it far too speculative to assign manganese toxicity as a cause for yield reductions using only a "differential diagnosis" or "rule out" method. This is particularly true where there are no test plot results showing that manganese toxicity can be induced in corn at the rates applied by Cargill. Finally, the fact (if it is one) that manganese may not have been needed on the farm in question or in

Nebraska soils more generally, does not establish that the application of manganese resulted in manganese toxicity or any other harm–those are two completely different scientific questions.

### *Conclusion*

In closing, I compliment counsel for the defendants. Against strong odds and very talented opposing counsel, the lawyers for the defendants pressed the matters discussed herein vigorously and with great skill. Nothing they did or failed to do played a part in this ruling. Sometimes the facts are simply not there and the law is against you, and this is one of those cases.

IT IS ORDERED that:

1. Except as noted on the record, Cargill's motion for judgment as a matter of law made at the conclusion of all the evidence is granted.

2. In particular, Cargill's motion for judgment as a matter of law particularly regarding causation and target yields is granted. The defendants' counterclaims predicated upon manganese toxicity or target yields are dismissed with prejudice. All affirmative defenses predicated upon manganese toxicity or target yields are likewise dismissed with prejudice.

3. A formal judgment will be entered later and at the appropriate time after the jury has considered the remaining issues.

DATED this 26th day of September, 2012.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge